Filed 9/28/23  In re M.G. CA1/4
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re M.G et al., Persons Coming Under the Juvenile Court Law. | |
| J.W. et al., <br><br> Petitioners, <br><br> v. <br><br> THE SUPERIOR COURT OF CONTRA COSTA COUNTY, <br><br> Respondent, <br><br> CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU et al., <br><br> Real Parties in Interest. | A167995 <br><br> (Contra Costa County Super. Ct. Nos. J2100203, J2100204, J2100205 & J2100206) |

J.G. (Mother) petitions for an extraordinary writ (Cal. Rules of Court, rule 8.452) in the juvenile dependency cases for her four children, M.G., B.G., L.G., and C.W.  She challenges the juvenile court's order after a contested 18-month review hearing wherein the court terminated family reunification services and

1

set a Welfare and Institutions Code[1] section 366.26 hearing. Mother asserts that the court erred because there was insufficient evidence that the children would be at a substantial risk of physical or emotional detriment in her care; she was not offered reasonable services during the review period; the court abused its discretion by limiting her educational rights for M.G., B.G., and L.G.; and the court abused its discretion with respect to its visitation order.

J.W., the father of C.W., also petitions for an extraordinary writ (Cal. Rules of Court, rule 8.452) commanding the trial court to set aside its order reducing his visitation with his daughter.

We find no error in the juvenile court's orders and deny the petitions.

## BACKGROUND[2]

The Bureau initially received referrals in this case alleging that Mother physically abused the children, engaged in domestic violence, abused drugs and alcohol, and Mother and J.W. had engaged in domestic violence in front of the children. When interviewed, M.G., B.G., and L.G. (collectively, the G. children) all articulated to the Bureau that Mother had substance abuse

---

[1] All further statutory references are to the Welfare & Institutions Code unless otherwise stated.

[2] As the parties are familiar with the factual and procedural history of the case, and this opinion does not warrant publication, we need not recite the full history. (*People v. Garcia* (2002) 97 Cal.App.4th 847, 851.) We instead summarize as necessary the parts of that history relevant to the issues raised by the petitions in light of our standards of review.

and violence problems, she hit them, and she had engaged in domestic violence with partners in their presence, including J.W.

On May 3, 2021, the Bureau filed section 300 petitions on behalf of M.G. (age 11), B.G. (age 10), L.G. (age 9), and C.W. (age 3). On May 5, 2021, the court detained the children.

At the jurisdictional hearing, Mother pleaded no contest to amended counts in all cases, and J.W. pleaded no contest to an amended petition in C.W.'s case. For Mother, the sustained allegations for the G. children under section 300, subdivision (a) were that each was at risk of physical harm because Mother had hit each child. The sustained allegations for the G. children under section 300, subdivision (b) were that Mother failed to protect the children in that she had a chronic polysubstance abuse problem that impaired her ability to provide a safe, stable living environment and adequate supervision, and she placed the children at ongoing risk of physical harm by engaging in acts of interpersonal domestic violence in the children's presence. For C.W., the sustained allegations under section 300, subdivision (b) were that Mother failed to protect C.W. in that she had a chronic polysubstance abuse problem that impaired her ability to provide a safe, stable living environment and adequate supervision, and she placed C.W. at ongoing risk of physical harm by engaging in acts of interpersonal domestic violence in her presence.

For J.W., the court sustained allegations under section 300, subdivision (b) that he failed to protect C.W. from Mother's ongoing polysubstance abuse, thus placing C.W. at serious risk of

harm and neglect, and he placed C.W. at ongoing risk of physical harm by engaging in acts of domestic violence.

At the dispositional hearing, Mother received family reunification services, and the court bypassed services for J.W. because of his prior conviction for a violent felony and court-required registration on a sex offender registry (§ 361.5, subds. (b)(12), (16)).[3] At the six-month review hearing, the Bureau expressed significant concerns with Mother's sobriety, her failure to participate in a substance abuse treatment program, her continued relationship with J.W., and her no-show to 13 of 16 random drug tests, but Mother's family reunification services were continued.

As of the 12-month review hearing on July 27, 2022, Mother had made significant progress with her case plan. She completed counseling and a domestic violence and anger management course. She began a substance abuse treatment program in May 2022 and finished it in July 2022, she was attending Alcoholics Anonymous (AA) meetings, she was working with her AA sponsor on a 12-step program, and she tested negative on 21 of 21 random drug tests. At the time, the Bureau believed that Mother could reunify with her children, and the court ordered another six months of reunification services. The 18-month review hearing was set for October 19, 2022.

---

[3] B.G., Sr. is the father of the G. children  The court bypassed reunification services for B.G. Sr., due to a violent felony conviction (§ 361.5, subd. (b)(12)), and B.G., Sr. is not a party to this writ proceeding.

4

By the time of the 18-month review hearing, the Bureau had changed its recommendation and asked the court to terminate Mother's reunification services and set a section 366.26 hearing. The following transpired during the applicable review period.

In August and early September of 2022, the children's visits with Mother progressed to overnight visits. The Bureau reported that C.W. enjoyed visits with J.W., the children enjoyed their visits with Mother, and the G. children expressed their desire to return to Mother's care as long as she stayed sober and J.W. was not around. Prior to the progression to overnight visitation, in July 2022, the social worker spoke to Mother to verify who was on Mother's apartment lease, and Mother sent a copy of the lease that listed only Mother. The social worker verified this information with the leasing office at Mother's apartment complex.

On September 16, 2022, the social worker spoke with J.W.'s parole officer. The parole officer had significant contact with Mother in the prior four months. In fact, the officer had spoken to Mother the day before regarding her providing birth certificates for C.W., B.G., and L.G. to get approval for J.W. to be around the children. The officer was unaware of M.G.'s existence, and her age of almost 13 concerned him because a condition of J.W.'s parole was that he not be around children 13 to 17 who were not his own. Mother had insisted to the social worker that she had not been around J.W. in the past months, but the parole officer said he had met with J.W. inside Mother's

apartment once and outside on numerous occasions, Mother was the contact for J.W.'s parole, and J.W. had been sleeping in Mother's car.

The social worker discussed this new information with Mother, and Mother claimed that she had no idea who the parole officer was, did not know how J.W. got into her home, and she had not told him where she lived. The Bureau cancelled unsupervised and overnight visits. The next day, on September 28, 2022, Mother showed up intoxicated at the house of C.W.'s caretaker, yelling that she wanted to kill the social worker. Mother missed a random drug test the following day.

In November 2022, the Bureau learned that Mother had unauthorized visitation with all four children on Halloween. Mother did not report this, despite meeting with the social worker the day after Halloween and being told that the case was where it was because of Mother's dishonesty. When questioned later about the Halloween visit, Mother was reluctant to answer and told the social worker she could ask her questions in court. Mother did, however, address what had happened with her apartment lease. She explained that J.W. had been on her lease because she needed his pay stubs as proof of income to secure the apartment, but she had since received a raise at work and he was no longer on her lease. Mother acknowledged that J.W. helped her move items from shared storage into the apartment, but she said he would not be around, and she would not answer the door if he showed up. Mother started individual therapy at the social worker's suggestion. She also revealed that she had not

6

connected with her AA sponsor in some time, but she continued to test negative.

At Mother's request, the Bureau arranged for a special visit with the G. children on Christmas Day, and it arranged for Mother to pick up presents for the visit on December 20, 2022. Mother did not show up to pick up the presents or to therapeutic visitation that day, so the social worker went to her apartment the next day to look for her. There were no sounds coming from Mother's apartment, so the social worker went to speak to the property manager. The property manager reported that she had not seen Mother in a couple of days, but, upon J.W.'s request, she had let him into Mother's apartment the day before. He was drunk, but she let him in because he said he lost his keys, he showed identification, and he was on the lease. The social worker asked to see Mother's lease and learned that J.W. was the primary tenant. The social worker showed the property manger a picture of the lease Mother previously sent to the Bureau, and the property manager confirmed that the lease was false. J.W.'s ankle monitor data showed that, in the past couple months, he was at Mother's apartment once and in the complex's parking lot once. When confronted with what the social worker had learned, Mother feigned surprise and said the situation was "baffling."

In January 2023, Mother sent the social worker a confusing text, and she also sent a confusing text to B.G. about letting C.W. rejoin therapeutic visitation. When L.G. and B.G. learned that J.W. had been at Mother's apartment the month prior, they said that they did not want to live with Mother. That same month,

7

Mother missed four out of six drug tests. B.G. also suspected that Mother was drunk with a black eye at a therapeutic visit at the end of the month, but the therapist did not make the same observation.

The following month, the court ordered no phone contact between Mother and the children as a result of her January texts, but Mother continued to text the children and the social worker had to remind Mother of the court's order. Mother missed a therapeutic visit on L.G.'s birthday, and she was caught recording C.W.'s responses to questions Mother asked about the Bureau's staff during a visit. At a check-in meeting, Mother told the social worker that she was still attending AA/Narcotics Anonymous (NA) meetings "here and there." She reported needing to find a new AA sponsor because hers had relapsed.

The 18-month hearing was set for a contest, and the court heard the matter on multiple days over the course of many months, concluding on May 31, 2023. The court heard testimony from social workers Drenik and Thomas, who were assigned to the case at various times, Mother, and J.W.[4] The documentary evidence admitted included exhibits from Mother; the Bureau's October 19, 2022 18-month review report; and the Bureau's update memoranda from December 2, 2022, January 26, 2022, and February 23, 2023.

The juvenile court rendered an oral statement of decision. It recited numerous instances in the review period where Mother deceived the Bureau, found the social workers' testimonies

---

[4] J.W. testified as to C.W.'s case only.

8

credible, and found the testimonies of J.W. and Mother to be overall not credible. The court concluded that reasonable services had been provided to Mother and return of the children to Mother's custody would create a substantial risk of detriment to their safety, protection or physical or emotional well-being. The court reduced visitation, limited Mother's educational rights for the G. children, and scheduled a section 366.26 hearing.

Mother and J.W. filed petitions for extraordinary writ relief. We stayed the section 366.26 hearing pending disposition of the petitions.

## DISCUSSION

### I. The Substantial Risk of Detriment Finding

#### A. *Governing Law*

Until reunification services are terminated, there is a statutory presumption that a dependent child will be returned to parental custody. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 308.) At the 18-month review hearing, the court must return the child to the custody of the parent unless it determines, by a preponderance of the evidence, that return of the child "would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.22, subd. (a).)

"In determining whether it would be detrimental to return the child . . . the court must consider whether the parent participated regularly in any treatment program set forth by the plan, the 'efforts or progress' of the parent, and the 'extent' to which the parent 'cooperated and availed himself or herself of

9

services provided.' (§ 366.22, subd. (a).)" (*Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738, 1748.) Thus, it is insufficient for the juvenile court to consider "the mere completion of the technical requirements of the reunification plan." (*In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1141.) However, the detriment standard is " 'a fairly high one. It cannot mean merely that the parent in question is less than ideal, did not benefit from the reunification services as much as we might have hoped, or seems less capable than an available foster parent or other family member.' It must mean what it says: that return presents a substantial risk of detriment to the child." (*Rita L. v. Superior Court* (2005) 128 Cal.App.4th 495, 505.) "We are looking for passing grades here, not straight A's." (*David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 790.)

"[T]he easy cases are ones where there is a clear failure by the parent to comply with material aspects of the service plan[,] . . . for example, a mother continued to test positive for illegal drug use, continued to move from place to place, failed to 'regularly' attend therapy, and failed to complete her parenting class. This was obviously enough to support a finding of detriment. [¶] The harder cases are . . . where the parent has complied with the service plan, but for some reason has not convinced a psychologist or social worker that it would be safe to return the child to the parent. The problem is not, as it were, quantitative (that is, showing up for counseling or therapy or parenting classes, or what have you) but qualitative (that is, whether the counseling, therapy or parenting classes are doing

10

any good). These are sensitive cases, fraught with emotional overtones, because they invariably deal with an evaluation of the personality, character and attitudes of the parent." (*Blanca P.*, *supra*, 45 Cal.App.4th at p. 1748, italics omitted.)

In all cases, the Bureau has the burden of establishing there is a substantial risk of detriment. (§ 366.22, subd. (a).) The reviewing court considers the entire record to determine whether there is substantial evidence to support the juvenile court's conclusions. The reviewing court reviews the record in a light "most favorable to the court's order and we indulge every inference in favor of the court's decision so long as those inferences . . . ' "rest on the evidence" [citation]' not 'mere speculation or conjecture.' " (*In re R.M.* (2009) 175 Cal.App.4th 986, 988–989.)

### B.  Analysis

The pertinent question is whether substantial evidence supports the juvenile court's conclusion that the Bureau established, by a preponderance of the evidence, that returning the children to Mother would "create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the [children]." (§ 366.22, subd. (a).) The answer is yes.

Regarding Mother's substance abuse problems, the evidence supports the trial court's conclusion that Mother did not get "passing grades" with her case plan. The sustained allegations here established that Mother had a substance abuse problem, and Mother herself attributed her violence to her alcohol abuse. Mother was ordered to attend a substance abuse

11

treatment program, including a 12-step program, and to submit to random drug tests. Mother had made substantial progress by the 12-month review hearing, but she later became noncompliant. Mother came intoxicated to C.W.'s caretaker's home on September 28, 2022, and threatened to kill the social worker. Mother was a no-show to a random drug test on September 29, 2022, which was considered a positive test under her case plan. As of November 2022, Mother had not seen her AA sponsor in a couple months, and she was not working on her 12-step program. The social worker instructed Mother to reach out to her sponsor or to find a new sponsor and report back. As of March 2023, Mother's prior sponsor had relapsed and Mother did not have a new sponsor. In January 2023, Mother was a no-show to 4 of 6 (67%) of her random drug tests. Mother testified that she had been sober since January 2022, but the court found that her testimony was not credible.

Mother claims that she completed substance abuse treatment, C.W.'s caretaker's report of her intoxication should be discounted, and her missed drug tests were insignificant. We are unpersuaded. Mother's drinking was a key issue from the beginning of the case, and the evidence indicating her continued drinking was of serious concern. Mother participated in services and achieved substantial progress during the 6- to 12-month review period, but she did not show she had reached her goal of remaining free from alcohol use and dependency. The evidence of ongoing instability in Mother's life in this area during the pertinent review period called into question her ability to keep

12

the children safe and adequately supported the court's detriment finding.

As to Mother's ability to protect the children from domestic violence, the court also found that Mother did not understand the risk of danger posed by J.W. Mother testified that she understood this risk, but the court concluded that she was not credible. The court's findings were supported by evidence showing that, during the pertinent review period, Mother lied about having no contact with J.W., she was in frequent contact with his parole officer, and she discussed providing birth certificates for C.W., L.G., and B.G. to get approval for J.W. to be around them. While the Bureau did not believe that J.W. lived with Mother, he was the primary tenant on her apartment lease, he had access to her apartment, and Mother went to elaborate lengths to conceal this. The court believed that Mother had a financial reason for initially putting J.W. on the lease, but it also found that her actions established that she did not understand the risk posed to the children by J.W.'s legal access to the apartment. The court found that J.W. intended to reengage with Mother based on his statements to family members that they could give C.W. back to Mother and him after court proceedings ended, and it was undisputed that the G. children were terrified of, and traumatized by, J.W. The record thus includes sufficient evidence to support the finding that there would be a substantial risk of detriment to the children if they were returned to Mother's care.

13

Mother relies on *Blanca P., supra*, 45 Cal.App.4th 1738, to argue that the Bureau's opinion about her lack of insight into the problems that led to removal is not substantial evidence, but *Blanca P.* is distinguishable. The juvenile court there had erred by assuming, without proof, that the father had engaged in child molestation. (*Id.* at p. 1747.) Against that backdrop, the appellate court found that the social worker's subjective opinion that the mother had failed to " 'internalize' " what she learned in parenting classes because she refused to believe the father was a child molester was insufficient to support a substantial risk of detriment finding. (*Id.* at p. 1751.) Here, the court did not rely on the Bureau's speculative and subjective opinion. Instead, evidence of Mother's own actions served as a factual basis for the court's conclusion that she failed to appreciate the risk posed by J.W., and hence there was a substantial risk of detriment.

While Mother made progress on many aspects of her case plan between the 6- and 12- month review period, that is not enough to justify reversal of the court's finding in this case. Sufficient evidence from the pertinent review period supports the court's orders.

## II.    Reasonable Services

Mother next contends that the Bureau's failure to offer her reasonable reunification services during the pertinent review period requires reversal of the court's orders. The Bureau

14

counters that the court's reasonable services finding was sufficiently supported. We agree with the Bureau.[5]

"[At the 18-month review hearing,] [t]he court shall determine by clear and convincing evidence whether reasonable services have been offered or provided to the parent or legal guardian." (§ 366.22, subd. (a)(3).) "The juvenile court's finding that reasonable services were provided is reviewed for substantial evidence." (*T.J. v. Superior Court* (2018) 21 Cal.App.5th 1229, 1238, disapproved on other grounds in *Michael G. v. Superior Court, supra*, 14 Cal.5th at p. 631, fn. 8.) "Substantial evidence is that which is reasonable, credible and of solid value." (*T.J. v. Superior Court*, at p. 1238.) In applying this standard, we "bear in mind that clear and convincing evidence was required in the trial court." (*Id.* at p. 1239.)

Reasonable services are "responsive to the unique needs of each family, and the plan must be ' " 'specifically tailored to fit the circumstances of each family' " ' and ' " 'designed to eliminate those conditions which led to the juvenile court's jurisdictional finding.' " ' " (*Patricia W. v. Superior Court* (2016)

---

[5] Citing to section 352 and *Michael G. v. Superior Court* (2023) 14 Cal.5th 609, Mother maintains that the juvenile court had discretion to continue the section 366.26 hearing and to order additional family reunification services. The Bureau argues that additional family reunification services were not allowed in this case because, at the time the court issued its orders, more than 24 months had passed since the children were removed from Mother's physical custody. Given our disposition, we need not decide if a court can extend family reunification services when more than 24 months have passed since the child was removed from the parent's physical custody.

244 Cal.App.4th 397, 420.) "Specifically, the record must show the agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the duration of the service plan, and made reasonable efforts to assist the parents when compliance was difficult." (*Ibid.*) Nonetheless, the "standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.) Further, "[r]eunification services are voluntary, and cannot be forced on an unwilling or indifferent parent." (*In re Jonathan R.* (1989) 211 Cal.App.3d 1214, 1220.)

Mother argues that services were unreasonable because the Bureau failed to assist her with finding housing or obtaining a restraining order against J.W. to allow her to stay in her apartment, the Bureau failed to assist her with the creation of a safety plan, it failed to provide adequate therapy services, and it failed to re-refer her for substance abuse treatment. As set forth below, these contentions lack merit.

With respect to housing, Mother sought the Bureau's assistance with her case plan's suitable housing requirement during the 6- to 12-month review period. The Bureau provided referrals, Mother obtained an apartment on her own, and the court's 12-month reasonable services finding stands unchallenged. In this review period, Mother maintained her apartment, and she never informed the Bureau that she needed housing assistance because of finances. Instead, in November

16

2022, Mother disclosed that J.W. had been on her apartment lease initially for financial reasons, but she claimed she had since received a raise and his name was off the lease. The Bureau did not learn that J.W.'s name remained on the lease until the end of December 2022. Mother moved sometime in January 2023, and she told the Bureau that she would rent a house if the children were coming back, but she did not want to pay for a bigger home if they were not. Nothing in the record suggests that Mother's financial state after November 2022 was such that she required assistance finding housing, or that the Bureau was aware of, and ignored, a need with respect to housing during the review period.

With respect to the safety plan, Mother contends that the Bureau should have provided her with a sample plan when she struggled to articulate her plan. But the Bureau's concern was not that Mother did not have a safety plan, it was that Mother could not readily articulate the points in her plan and Mother did not want to talk about her safety plan. The Bureau was not tasked with forcing Mother to discuss and fully grasp her safety plan. (*In re Jonathan R.*, *supra*, 211 Cal.App.3d at p. 1220 ["[r]eunification services are voluntary, and cannot be forced on an unwilling or indifferent parent"].)

Next, Mother's contention that the Bureau should have arranged for separate family therapy sessions with the G. children and been quicker to initiate more sessions for C.W. highlights, at most, that services were not perfect. "In almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect."

17

(*In re Misako R.*, *supra*, 2 Cal.App.4th at p. 547.)  Family therapy was part of Mother's case plan, the Bureau provided referrals, and the G. children had family therapy throughout the review period.  Social worker Drenik, who was on the case before going on leave in July 2022, made a referral for C.W., and a clinician was assigned.  The services provider recommended combining the therapeutic visits.  C.W. participated in two group therapy sessions, but Mother and the G. children requested that she stop due to her disruptive behavior.  The social worker did not thereafter refer C.W. for more sessions until Mother asked for services because of the therapist's feedback that the G. children had the bigger issues and her feedback about how sessions with C.W. had gone.  Considering the provider's election to proceed with group therapy and feedback, the court's conclusion that services were reasonable under the circumstances is sufficiently supported.

Mother's final claim that the Bureau could have re-referred her for an assessment when it became concerned about her sobriety in January 2023 also highlights, at most, less than perfect services.  Mother had been given referrals for, and completed, a substance abuse program.  She maintained that she was sober during this review period, she was connected with 12-step program, and she randomly drug tested.  The Bureau monitored Mother's drug tests, and it checked in with her on AA compliance.  When Mother disclosed that she had not seen her sponsor for a while, the social worker counseled her to contact her sponsor or seek out a new one if necessary.  In January 2023,

18

Mother missed numerous drug tests. The continued 18-month review hearing began in February 2023. In an ideal world, the Bureau may have re-referred Mother after January 2023, but, given the services already provided and the timing, the Bureau's actions in following up on Mother's AA compliance and providing drug testing were reasonable.

In sum, Mother's claims regarding the court's reasonable services finding lack merit. Furthermore, even assuming that the court could order additional family reunification services in this case, Mother does not establish entitlement to such services in light of the court's unchallenged finding that additional reunification services were not in the best interests of the children. (See *Michael G.*, *supra*, 14 Cal.5th at pp. 634–635 [before extending family reunification services beyond the presumptive 18-month maximum, court must find additional family reunification services are not contrary to child's interests].)

## III. Educational Rights

The trial court signed JV-535 orders limiting Mother's right to make educational decisions for the G. children.[6] Mother

---

[6] Mother notes an ambiguity in the record. The court's oral pronouncement at times mentions an educational rights limitation and at times refers to Mother's rights to make educational and developmental services decisions. Boxes "1a." on the first pages of the signed JV-535 orders, which indicate whether the orders implicate Mother's right to make "educational" and/or "developmental services" decisions, are unchecked, however, the following pages in those orders confer authority upon the designated third parties for only educational decisions. The Bureau's request was also limited to educational

argues that the court abused its discretion when it limited her educational rights on the facts of this case.  We disagree, "bearing in mind [that] '[t]he focus of dependency proceedings is on the child, not the parent.' " (*In re R.W.* (2009) 172 Cal.App.4th 1268, 1277.)

"Parents have a constitutionally protected liberty interest in directing their children's education.  [Citations.]  However, when a child is a dependent . . . , a court may limit a parent's ability to make educational decisions on the child's behalf." (*In re R.W.*, *supra*, 172 Cal.App.4th at p. 1276.)  At every review hearing in dependency proceedings, the juvenile court must decide whether it is appropriate to limit the rights of the parent to make educational decisions for the child.  (Cal. Rules of Court, rule 5.649(a).)  The Bureau must provide the court with information regarding the parent's unwillingness or inability to make educational decisions for the child.  (§ 366.1, subd. (e).)  A court may limit a parent's educational decision-making rights for a dependent child "[i]f necessary to protect [the] child." (Cal. Rules of Court, rule 5.649(a).)  Any limitations on the parent's educational rights "shall be specifically addressed in the court order.  The limitations may not exceed those necessary to protect the child." (§ 361, subd. (a)(1).)

---

rights.  Circumstances thus dictate that we deem the court's orders to limit only Mother's educational rights and not her rights with respect to developmental services.  (Cf. *In re Merrick V.* (2004) 122 Cal.App.4th 235, 249 [conflicts between reporter's and clerk's transcripts are resolved in favor of reporter's transcript unless particular circumstances dictate otherwise].)

20

The court did not abuse its discretion. The G. children needed active adult engagement in, and supervision of, their academic progress. M.G. had a 504 plan, with a requested reassessment for an Independent Education Plan (IEP) pending, and B.G. had an IEP. Mother was unable to communicate with the children on a daily basis given the court's order of no phone contact. Mother had missed some school meetings and failed to schedule educational meetings and submit educational paperwork expeditiously. Further, when the social worker requested a copy of B.G.'s IEP for his new school, Mother referred the social worker to her attorney and did not send the IEP. On this record, the court could reasonably order the limitation of Mother's educational rights to ensure prompt and consistent attention to the children's educational needs.

Mother argues the contrary—that there was no reasonable basis to limit her control over the children's education, and she is capable of directing the children's education. As the juvenile court noted, there was evidence that Mother engaged in some of the educational components of the children's lives. While we agree that there is evidence in the record that could support a decision granting Mother continued control over the G. children's education, our review in this case is limited. The court found, on balance, that Mother was unavailable, unwilling, or unable to exercise educational rights for the children.[7] Where, as here,

_____

[7] In its statement of decision, the juvenile court referenced section 319, which provides the legal standard applicable to orders limiting a parent's educational rights before the child is adjudged a dependent. Section 361 governs thereafter. (§ 361,

21

there is more than one reasonable inference that may be drawn from the record before us, we have no authority to displace a rational decision of the trial court. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 319.)

Mother also contends that the juvenile court erred in issuing an overbroad order because shared educational rights would be more appropriate. We disagree that the court acted outside of the bounds of reason. In its statement of decision, the court highlighted instances of Mother's uncooperative attitude with the social workers, and it was not unreasonable for the court to impliedly conclude that shared rights, if even allowed by statute, might engender additional conflict and would not be in the best interests of the children.

## IV.    Visitation

Finally, Mother and J.W. claim that the court abused its discretion with its visitation orders. J.W. had one-hour visits

---

subd. (a)(1).) Section 319 required the court to find that the parent "is unavailable, unable, or unwilling to exercise educational" rights, and the child's educational needs "cannot be met" without appointment of a responsible adult. (§ 319, subd. (j)(1)(A)–(C).) Mother forfeited any claim that the court used an incorrect legal standard by failing to raise the issue on appeal. (See *People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9.) There would also be no reasonable probability of a more favorable result had the court used the "necessary to protect" (§ 361, subd. (a)) standard, considering the court's express and implied findings that Mother was unavailable, unwilling, or unable to make educational decisions, and that the children's needs could not be met without the court's order. (See *In re Celine R.* (2003) 31 Cal.4th 45, 59–60 [dependency judgments subject to harmless error analysis].)

with C.W. three times per month, and Mother had two-hour visits with all children four times per month.  For C.W., the court reduced J.W.'s minimum visitation to a single one-hour visit, once a month, and it reduced Mother's minimum visitation to one-hour visits, twice a month.  For the G. children, the court reduced Mother's visitation to two-hour visits, twice a month.  The court also ordered the Bureau to consider the children's wishes, input from the children's counsel, and input from the children's therapists in establishing the frequency, time, and place of visits.  Neither parent shows that the court abused its discretion.  (*In re J.P.* (2019) 37 Cal.App.5th 1111, 1119 [visitation orders reviewed for abuse of discretion].)

The parents contend that the court erred because the evidence showed that their visits went well, and Mother argues that the evidence shows that the children were bonded to her, and meaningful visitation is pivotal to the parent-child relationship, citing *In re Hunter S.* (2006) 142 Cal.App.4th 1497, 1504.  J.W. also appears to suggest that there must be a showing of detriment to reduce visitation.  *Hunter S.*, however, involved issuance of a visitation order that gave a child unfettered discretion to prevent visitation by refusing to see his parent.  The court there recognized that the law required visitation to continue even after family reunification services are terminated unless the court finds that visitation would be detrimental to the child.  (*Ibid.*, citing § 366.21, subd. (h).)  Here, the court ordered continued visitation, so there was no statutory violation. (§§ 366.21, subd. (h), 366.22, subd. (a)(3).)

As for the frequency of visitation, the juvenile court has "great discretion in deciding issues relating to parent-child visitation," the exercise of which "we will not disturb on appeal unless the juvenile court has exceeded the bounds of reason." (*In re S.H.* (2011) 197 Cal.App.4th 1542, 1557–1558.) When reunification services end, "the parents' interest in the care, custody and companionship of the child [is] no longer paramount," and " 'the focus shifts to the needs of the child for permanency and stability.' " (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 317.)

There was no abuse of discretion in the court's visitation orders. C.W.'s therapist recommended reduced visitation because C.W. displayed anxiety on the day before, and dysregulated behavior on the day of, visits with J.W. and Mother. C.W. told the social worker that Mother asked her to keep the most secrets, the social worker reported that Mother coached C.W. during visits, and Mother was caught recording C.W.'s responses to Mother's questions about the Bureau during a visit. The social worker testified that the Bureau considered the children's needs when making the visitation recommendation, and that frequent visits make them think they are going home, giving them false hope and preventing them from settling down. Mother had missed some visits, and the G. children said they were okay with some decreased visitation with Mother as long as they continued to be able to see C.W. After the court decided to terminate reunification services, it became appropriate to fashion a visitation order that balanced the parents' right to contact with

24

the children's interest in moving towards permanency.  The court reasonably reduced visitation here, and its orders allowed the Bureau the flexibility necessary to accommodate the evolving needs of the children.

## DISPOSITION

The petitions are denied on the merits.  (See § 366.26, subd. (*l*)(1)(C); Cal. Rules of Court, rule 8.452(h).)  This court's stay of the section 366.26 hearing (which was previously set for September 13, 2023) is lifted.  Our decision is final as to this court immediately.  (Cal. Rules of Court, rule 8.490(b)(2)(A).)


BROWN, P. J.


WE CONCUR:

GOLDMAN, J.
HIRAMOTO, J.*


*In re M.G. et al.*  (A167996)

---

* Judge of the Superior Court of California, County of Contra Costa, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.